UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

v. Case Nos.: 1:19cr27-AW/MAL
1:23cv208-AW/MAL

JAMES FARRELL WILKERSON,
Defendant.

---

# REPORT AND RECOMMENDATION

This case is before the Court on Defendant James Wilkerson's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody" and supporting memorandum of law. ECF Nos. 131, 132. The Government filed a response and Wilkerson filed a reply. ECF Nos. 132, 135. After careful consideration of the motion, the record, and the relevant law, I recommend the § 2255 motion be denied without an evidentiary hearing. Wilkerson's three grounds for relief alleging ineffective assistance of trial counsel (for not presenting evidence showing Detective Pandak had motive to plant the firearm to retaliate against Wilkerson for a prior dismissed case and to provide leverage to convince Wilkerson to testify for the State in a case involving the murder of William Redd, for interfering with his right to testify, and for inadequate representation at sentencing) cannot support findings of deficient performance or prejudice.

## I. BACKGROUND

On August 27, 2019, a federal grand jury charged Wilkerson with a single count of possession of a firearm and ammunition by a convicted felon. ECF No. 1. Wilkerson proceeded to trial, represented by appointed counsel Anderson Hatfield. The jury found Wilkerson guilty. ECF Nos. 79, 117-119.

Wilkerson's firearm charge arose from an October 30, 2018, encounter he had with Detectives Pandak and Blizzard at a campsite in an area known as "the Slab" in Gainesville, Florida. ECF No. 128 at 4-5 (Eleventh Circuit opinion on appeal). One of the main issues at trial was whether Wilkerson's DNA ended up on the firearm because of contamination. *Id.* at 5-6, 10.

Detective Pandak testified that he and Detective Blizzard were investigating the gunshot homicide of Michael Brooks[1] and a recent shootout at the Slab. ECF No. 116 (trial transcript) at 45-46, 62, 65-66, 89. At approximately 10:30 a.m. on October 30, 2018, they approached Wilkerson, who was sitting in a tent with Ms. Dejanee Petty. *Id*. at 65-66, 69-70, 75-76. The detectives smelled marijuana. *Id.* 71, 148. When Wilkerson refused to show an item that he was holding in his hand, which turned out to be a small bag of marijuana, Detective Pandak grabbed Wilkerson's arm and "attempted to open his fist." *Id.* at 72-73. Detective Blizzard grabbed

[1] The Michael Brooks murder is not the same as the William Redd murder that Wilkerson argues his lawyer was ineffective for not presenting as a reason why law enforcement targeted him. ECF No. 131 at 5.

Wilkerson's other arm, and they all fell to the ground in the area to the front of where Wilkerson was sitting and in front of where the firearm was later found. *Id.* at 72-73, 100. After an 8-10 second scuffle, the detectives were able to put Wilkerson's hands behind his back and handcuff him. *Id.* at 73, 151. They then stood Wilkerson up and Detective Pandak walked him to a patrol car which had arrived on scene. *Id.* at 101, 154, 216.

Detective Blizzard stayed in the tent with Ms. Petty. *Id.* at 154-55. After securing Wilkerson, Detective Pandak went back to the tent to look for contraband. *Id.* at 102, 154-55. Detective Pandak found a bag of marijuana, a firearm in a holster, and a blunt. *Id.* at 74, 80, 175. It was undisputed that Detective Pandak touched the firearm holster, the bag of marijuana, and the blunt. *Id.* at 83-84, 102-104. Detective Pandak was not wearing gloves when he did so, nor was he wearing gloves earlier when he grabbed and struggled with Wilkerson. *Id.* at 98, 179. The amount of Wilkerson's DNA on the firearm and magazine, according to expert testimony at trial, was within the range of secondary transfer through body fluid. ECF No. 117 at 189, 234-35.

As to the amount of Wilkerson's sweat that could have been present, Detective Pandak testified that the day was not particularly hot, that Wilkerson was wearing jeans and a sweatshirt, and he did not notice Wilkerson sweating. ECF No. 116 at 75, 94. Detective Blizzard did not recollect the day being particularly hot and he

himself did not work up a sweat. *Id.* at 151. In contrast, Ms. Petty testified that the day was hot and she and Wilkerson had been in the tent for 30 to 45 minutes before law enforcement came in. *Id.* at 196. Ms. Perry testified that she was sweating and that Wilkerson was "sweating bad." *Id.* at 267.

Besides Detective Pandak touching a possibly sweaty Wilkerson and then touching the evidence, there were other opportunities for secondary transfer. Officer Miller arrived on scene with a patrol car to transport Wilkerson to the jail. *Id.* at 216. She was asked to collect the firearm and other evidence from the tent. *Id.* at 217. Unlike Detective Pandak, Officer Miller wore gloves, but she used the same gloves to handle all the evidence. *Id.* at 217, 227. Officer Miller did not have standard paper evidence bags to place the evidence in, nor did Officer Ryan who also arrived on scene. *Id.* at 218-19. Officer Miller testified that she placed the holstered firearm in a plastic grocery store bag together with the bag of marijuana and the blunt, then wrapped the items tightly so they did not move or fall out. *Id.* at 219-20, 229. Officer Miller could not remember if she also collected Wilkerson's hat or if someone else did. *Id.* at 237. At the time, the hat was considered Wilkerson's personal property, not evidence, so Officer Miller did not place it in the plastic bag. *Id.* at 226. She did, however, turn over the hat with the plastic bag when she went to the police station. *Id.* at 243-44.

The evidence and the hat were processed at the police station by Crime Scene

Investigator Foong. ECF No. 117 at 4, 6. Investigator Foong first photographed the evidence in the plastic bag. *Id.* at 7. Then she handled the firearm to remove the magazine and remove ammunition from the chamber. *Id.* at 9. She photographed the firearm again after it was made safe. *Id.* at 11. She swabbed the firearm, magazine, and ammunition for DNA. *Id.* at 13-14, 17. Investigator Foong wore gloves when she handled the evidence but did not change gloves. *Id.* at 42-43, 46-47. She used the same pair of gloves to touch all the evidence that was in the plastic bag. *Id.* Afterward she photographed the hat. *Id.* at 65, 66.

DNA analyst Amanda Stratton of the Florida Department of Law Enforcement testified that DNA consistent with Wilkerson's DNA profile made up 94% of the mixture recovered from the pistol and 93% of the mixture recovered from the magazine. *Id.* at 134, 167-68. Both DNA swabs contained a significant amount of DNA. *Id.* at 186. Analyst Stratton explained that the DNA could have transferred from one item to another while they were stored in the grocery bag if wet bodily fluid was present. *Id.* at 174-75. She noted that sweat can play a role in DNA transfer. *Id.* at 177. In her opinion, the amount of DNA observed on the samples was "not typical with secondary transfer of touch DNA … [a]nd more likely the result of repeated handling from a primary handler – multiple – handled multiple times without cleaning in between or the result of a rich source of DNA such as a bodily fluid." *Id.* at 189.

Wilkerson did not testify, but the defense called two witnesses. Marcella Scott, who was Analyst Stratton's supervisor, explained how the forensic evidence came to be analyzed after the Florida Department of Law Enforcement initially refused to do so. ECF No. 117 at 204-209, 210-212. Supervisor Scott testified that the Florida Department of Law Enforcement had a policy not to analyze samples for cases involving possession of a firearm by a convicted felon, but one of the reasons they worked on Wilkerson's case was information received from Detective Pandak that Wilkerson may have been involved in a homicide. *Id.* at 117, 206, 210. Detective Pandak contacted the lab twice about the evidence. *Id.* at 207. Ms. Scott's testimony corroborated a suggestion Attorney Hatfield developed in Detective Pandak's cross-examination that Detective Pandak was biased against Wilkerson because Wilkerson was his prime suspect in the murder of Willie Brooks. ECF No. 116 at 115-17.

The defense also presented expert testimony from Candy Zuleger, an independent forensic DNA consultant. ECF No. 117 at 216. Ms. Zuleger agreed with Analyst Stratton's probability statistics concerning the likely presence of Wilkerson's DNA in the samples collected. *Id.* at 221-22, 237-38, 242, 246. Ms. Zuleger concurred that there was greater potential for DNA transfer if Wilkerson had been sweating. *Id.* at 229. Ms. Zuleger noted, moreover, that Wilkerson's DNA could have been transferred to the firearm in multiple ways, such as by Wilkerson sitting near the firearm and shedding skin cells or sneezing, coughing or spraying saliva

while talking, by falling on the firearm during his scuffle with Detectives Pandak and Blizzard, by contamination by Detective Pandak touching it, by being wrapped in the same plastic grocery bag with the bag of marijuana Wilkerson clutched during the struggle and a blunt that may have had saliva on it, and by Investigator Foong's handling of the evidence with the same gloves. *Id.* at 225, 229-32. According to Ms. Zuleger, a person who never touched an item can become a major donor of a DNA sample taken from the item. *Id.* at 228. She noted that the amount of DNA recovered from the magazine was barely enough to get a DNA type and the firearm had a little bit more DNA but still not a large amount. *Id.* at 234. The amount of DNA was in the range of secondary transfer. *Id.* at 234-35. According to Ms. Zuleger, the fact that the firearm was holstered until Investigator Foong removed it did not reduce the potential for secondary transfer because the DNA swab was taken from several areas of the firearm, and the holster did not cover the entire firearm. *Id.* at 236.

In rebuttal, Analyst Stratton testified that the amount of DNA recovered from the magazine was not low, as Ms. Zuleger had stated, but very high. *Id.* at 265.

After Wilkerson was found guilty by the jury, a Presentence Investigation Report was prepared and reflected he was an armed career criminal with a total offense level of 33 and a criminal history category of IV. ECF No. 88, PSR ¶¶ 25, 37. Attorney Hatfield objected to Wilkerson's classification as an armed career criminal. PSR ¶ 92; ECF No. 119 at 4-19. The court overruled the objection, ECF

No. 119 at 19, and sentenced Wilkerson at the high end of the applicable guideline range to a term of 235 months of imprisonment. ECF Nos. 100, 119.

Wilkerson appealed, challenging the sufficiency of the evidence supporting his conviction. ECF No. 128 at 4. He also challenged his sentence as both procedurally and substantively unreasonable. *Id.* On May 16, 2022, the Eleventh Circuit affirmed, finding sufficient evidence to support his conviction and no sentencing errors. *Id.* Through counsel, Wilkerson timely filed his § 2255 motion on August 14, 2023. ECF No. 131.

## II. DISCUSSION

In Wilkerson's § 2255 motion, he claims Attorney Hatfield was constitutionally ineffective for three reasons. In Ground One he complains Attorney Hatfield failed to present evidence at trial to support his theory of innocence, which is that Detective Pandak had motive to plant the firearm to retaliate against Wilkerson for a prior dismissed case and to provide leverage to convince Wilkerson to testify for the State in a case involving the murder of William Redd. ECF Nos. 131 at 5-6; 132 at 15-16. In Ground Two Wilkerson complains Attorney Hatfield "interfered" with his right to testify at trial by failing to advise Wilkerson that "if he testified to the correct number of felonies, the jury would only learn the number of felonies" he had been convicted of and not the nature of the felony convictions. *Id.* at 8. In Ground Three Wilkerson claims (1) Attorney Hatfield's representation at

sentencing was deficient and (2) his sentence is illegal. *Id.* at 11. Wilkerson claims he is entitled to a new trial due to Attorney Hatfield's ineffectiveness. ECF No. 132 at 2.

**A. Ineffective Assistance of Counsel Standard**

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) his attorney's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that absent counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). There are few defendants that can satisfy both *Strickland* prongs. *Johnson v. Alabama*, 256 F.3d 1156, 1175 (11th Cir. 2001).

There is a strong presumption that counsel's conduct satisfies the performance prong, and to rebut that presumption the defendant must show that no competent lawyer would have taken the same course of action that his lawyer took. *Hollis v. United States*, 958 F.3d 1120, 1122 (11th Cir. 2020). The standard is objective. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). For example, if any reasonable lawyer could have refused to pursue a certain defense strategy or present a certain witness, deficient performance cannot be shown based on action consistent with the rejection. *Id.* at 1315-1316 & n.17.

As for the prejudice prong, after considering the totality of mitigating and

aggravating evidence, "the likelihood of a different result must be substantial, not just conceivable." *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1264 (11th Cir. 2020). A defendant must establish "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Considering the above principles and presumptions, "the cases in which habeas petitioners can properly prevail [with claims of ineffective assistance of counsel] are few and far between." *Chandler*, 218 F.3d at 1313.

**B. Wilkerson's Grounds for Relief**

**1. Ground One**

In Ground One, Wilkerson claims Attorney Hatfield was ineffective because he failed to present evidence at trial to support his "theory of innocence," which is that Detective Pandak could have planted the firearm to retaliate against Wilkerson for a prior dismissed case and to provide leverage to convince Wilkerson to testify for the State in the 2012 William Redd murder case against Willie Brooks. ECF Nos. 131 at 5-6; 132 at 15-16. Wilkerson explains that in contrast to his "theory of innocence," Attorney Hatfield only attempted to show that Wilkerson was not in possession of the firearm, and that the only reason his DNA was discovered on it was because of DNA transfer or contamination. ECF No. 131 at 5. Wilkerson acknowledges that "[t]he evidence against him was circumstantial at best, and was not strong." ECF No. 132 at 18. He also acknowledges that Attorney Hatfield

presented expert evidence about secondary DNA transfer to support the defense presented at trial. ECF No. 131 at 5.

Wilkerson argues, however, that the defense Attorney Hatfield presented to the jury was inadequate because it did not contain his "theory of innocence." *Id.* He explains,

> [T]he main question that would run through any reasonable juror[']s mind is why. Why would law enforcement want [Wilkerson] to be guilty of a crime so badly, as to go through this type of lengths to get a conviction? The answer is William Redd and Willie Brooks.

*Id*.

Wilkerson claims that Detective Pandak "found [him] in a location where it would be easy to place a firearm in a place where [Wilkerson] could have been in constructive possession of it." *Id.* at 6. He argues Attorney Hatfield should have presented evidence that law enforcement hoped to secure his cooperation in the State murder case against Willie Brooks for killing William Redd.[2] *Id.* at 5-6.

Wilkerson claims that law enforcement was using this federal firearms case

---

[2] According to Wilkerson, Willie Brooks allegedly had William Redd killed in 2012 (approximately six years before Wilkerson's arrest in this federal case) because Brooks did not want Redd to testify against Brooks on another matter. ECF No. 131 at 7, ECF No. 132 at 15. Several years before this federal case, when Wilkerson had State charges pending, Wilkerson was listed as a witness in the State murder case against Willie Brooks. ECF No. 131 at 5. Wilkerson "was not necessarily thrilled to be a witness to the crime and for good reason, was afraid to testify." ECF No. 132 at 15. Once Wilkerson's State charges were dismissed, Wilkerson changed his mind and decided not to cooperate in Willie Brooks' prosecution, and law enforcement allegedly told him that he would "regret that decision." ECF No. 131 at 6.

as a means of gaining leverage to encourage him to cooperate in the State murder case. *Id.* at 6-7. He maintains from the "first day of the federal prosecution, he was again bombarded with questions about whether [he] would cooperate in the murder case," and two of his attorneys in this case told him if he cooperated the federal case "could all go away."[3] *Id.* at 6-7. In further support of his contention that this case and the State murder case were related, Wilkerson points out that the initial prosecuting attorney in the State murder case was Christopher Elsey, who later joined the Office of the United States Attorney and was the prosecutor in this federal case. ECF No. 132 at 17.[4]

Wilkerson claims Attorney Hatfield's failure to present this information regarding "bias and motivation" to the jury, resulted in his conviction. ECF No. 132 at 18. Wilkerson qualifies his "theory of innocence" by stating that he:

> is not suggesting that this type of evidence would have been presented

---

[3] Wilkerson claims he was last approached about cooperating in June of 2022, after the Eleventh Circuit affirmed his conviction and sentence in this case. ECF No. 132 at 18, n. 8. As proof of the importance of his testimony against Willie Brooks, Wilkerson notes that when the State brought the murder case against Brooks it intended to seek the death penalty, but in September of 2022, after he declined to cooperate for the last time, Brooks was able enter a negotiated plea to lesser charges and receive a sentence of only ten years. ECF No. 131 at 7; ECF No. 132 at 18, n.8.

[4] As Wilkerson indicates, Christopher Elsey signed Wilkerson's indictment on August 27, 2019, but was not appointed as a special United States Attorney until August 29, 2019. ECF No. 132, Ex. 6. His special appointment was for a one-year period, which he extended for an additional year until after Wilkerson's case had concluded. *Id.* at Ex. 8. Although Wilkerson does not argue that the indictment was invalid, this court notes that under Federal Rule of Civil Procedure 7(c)(1), an indictment "must be signed by an attorney for the government." Wilkerson's indictment was signed by U.S. Attorney Lawrence Keefe, *see* ECF No. 1 at 4, which would meet the requirements of the rule.

> as the truth of what took place. However, it is submitted that a very ironic inference could have been drawn and argued by counsel because of the sheer number of coincidences and outcomes.

ECF No. 131 at 7.

As an initial matter, there appears to be a conflict about whether Wilkerson advised Attorney Hatfield of the basis for his "theory of innocence." When the issue of the William Redd murder case was discussed at sentencing, Attorney Hatfield stated that this was the first he had heard of this federal case relating to the Redd murder. ECF No. 119 at 58.[5] Attorney Hatfield's statement appears to conflict with Wilkerson's assertion that Attorney Hatfield "was aware of the facts (surrounding law enforcement's underlying motivations) but failed to present this to the jury."[6] ECF No. 132 at 18; ECF No. 131 at 7 ("trial counsel was aware of this underlying motivation").

This Court does not need to resolve the conflict, however. Even if Attorney Hatfield had known about Wilkerson's theory of the relationship between the two cases, a reasonable attorney could have made a strategic decision not to pursue it.

First, the failure of law enforcement to use or change gloves when handling

[5] Mr. Hatfield said "this is the first I've heard about that this involved the murder of somebody named Redd at some place that Mr. Wilkerson would have had knowledge of, and that he was supposed to have been offered the job but it wasn't enough money and all that." ECF No. 119 at 58. Attorney Hatfield argued that the information presented was unsubstantiated hearsay that could not be investigated to determine its reliability. *Id.*

[6] Wilkerson also claimed that trial counsel advised him if he cooperated in the state murder case "[the federal case] could all go away." ECF No. 131 at 6-7.

the evidence, and failure to place the evidence in separate paper evidence bags, was presented at trial in the Government's case-in-chief. This evidence was not contested, and thus Wilkerson's "theory of innocence" would not have helped here to "tip the scales in [Wilkerson's] favor." ECF No. 132 at 18. Instead, it would have muddled a straightforward defense of contamination with an improbable conspiracy theory that Detective Pandak might have planted the gun or that some kind of "ironic inference" could be drawn. ECF No. 131 at 7.

Second, although there were disputes about whether the day was hot, whether Wilkerson had been sweating, and whether Wilkerson could have fallen on the firearm during the struggle, a reasonable attorney could have decided not to follow Wilkerson's proposed theory of defense. Ms. Perry testified that the day was hot, that she was sweating, and that Wilkerson was "sweating bad." ECF No. 116 at 267. Detective Pandak testified that Wilkerson was his prime suspect in the October 2018 murder of Michael Brooks. *Id.* at 116. The testimony was enough to show possible bias and lead the jury to question the accuracy of the detectives' perceptions. It was a reasonable trial strategy to argue to the jury the inferences that could be made based on the evidence presented, rather than introducing additional evidence that would tie Wilkerson to another murder.

Third, it is not clear who, other than Wilkerson himself, could have testified to the officers' alleged ulterior motive. Had Wilkerson testified, he would have

opened himself up to potentially damaging lines of questioning. For instance, the jury may have viewed Wilkerson negatively upon learning he had knowledge of but refused to testify in a capital murder case. Furthermore, the basis for Wilkerson's knowledge about the murder, according to Christoper Elsey's synopsis at sentencing, was that Wilkerson had been approached about conducting the "hit" on William Redd but he had not been offered enough money to do so. ECF No. 119 at 57. Moreover, as will be explained in the discussion of Ground Two, the jury could have learned of the nature of Wilkerson's prior felony convictions in addition to the number of prior felony convictions.

In sum, the record does not support Wilkerson's position that Attorney Hatfield was ineffective for not presenting his "theory of defense," nor is the Court persuaded that it is likely Wilkerson would not have been convicted had such evidence been presented. *See Strickland*, 466 U.S. at 687, 693; *Chandler*, 218 F.3d at 1318.

**2. Ground Two**

In Ground Two, Wilkerson argues that his right to effective assistance of counsel was violated when Attorney Hatfield "interfered" with his right to testify. According to Wilkerson, Attorney Hatfield "interfered" by not explaining correctly the limited scope of information about Wilkerson's prior convictions that could be used against him if he testified. ECF No. 131 at 8; ECF No. 132 at 19. Wilkerson

claims that Attorney Hatfield recommended he not testify because of his prior convictions but failed to advise him "that if he testified to the correct number of felonies, the jury would only learn the number of the felonies instead of the charges he was convicted of." ECF No. 131 at 8; ECF No. 132 at 20.

Wilkerson insists he did not testify only because he believed the nature of his prior convictions (including robbery with a firearm, aggravated assault [with firearm] and trafficking in cocaine) would present him in a bad light. ECF No. 132 at 20. He says had he known that the jury would not learn this information, so long as he truthfully identified the number of convictions he had, he would have testified to his innocence. *Id.* Specifically, Wilkerson states he would have testified about "the State's consistent inquiry" to obtain his cooperation in the William Redd murder case, that law enforcement told him he would regret his decision not to cooperate, and that "he never saw a gun that day until Detective Pandak miraculously located it by the tent and claimed it belonged to him." ECF No. 131 at 8-9.

Wilkerson's claim in Ground Two is based on an understanding of the law that is incorrect. There is simply no bright-line rule that federal courts[7] may only admit evidence of the number of a defendant's prior convictions, without reference to the

[7] State courts in Florida following Florida evidence rules may limit impeachment to the number of convictions but "no federal court has used [this] approach except where, under the specific facts of the case, disclosure of the nature of the prior felony would be particularly prejudicial." 28 Charles Alan Wright & Victor James Gold, 28 Fed. Prac. & Proc. Evid. § 6134(a)(1) at n.39, (2d ed).

nature of the convictions, for the purposes of impeachment under Federal Rule of Evidence 609. "Most courts and commentators favor limiting admissibility to so-called 'essential facts' of the conviction. These facts include the number of convictions, the nature of each underlying crime, the time and place of each conviction, and the punishment." 28 Charles Alan Wright & Victor James Gold, 28 Fed. Prac. & Proc. Evid. § 6134(a)(1) (2d ed).

"The implicit assumption of Rule 609 is that prior convictions have probative value[,]" although the "probative value is likely to vary depending on the number and type of convictions." *United States v. Burston*, 159 F.3d 1328, 1335, 1336 (11th Cir. 1998). With respect to defendant-witnesses, such evidence is admissible only "if the probative value of the evidence outweighs its prejudicial effect." Fed. R. Evid. 609(a)(1)(B). Thus, Rule 609 does not categorically prohibit introduction of more than the number of convictions, as Wilkerson claims. The Government "may use the convictions to impeach [the defendant] by asking him about the nature, number, and dates of convictions …." *United States v. Rothwell*, No. 3:17-cr-112/MCR, 2018 WL 11251341, at *4 (N.D. Fla. Mar. 30, 2018) (citing cases).

Attorney Hatfield did not incorrectly advise Wilkerson. Wilkerson himself admits that "the nature of [his] prior convictions [were] why he did not want to testify because he believed those would paint him in a bad light." ECF No. 132 at 20. Had he testified, the district court would have been well within its discretion to permit

the Government to inquire about the nature of Wilkerson's prior convictions, after determining that the probative value of this evidence outweighed its prejudicial effect.[8] Attorney Hatfield committed no error in the advice he gave, so his performance cannot be deficient under *Strickland*. Furthermore, given the considerations discussed in the previous section about the potential dangers with Wilkerson's testimony, he has not shown that the outcome of the proceedings likely would have been different had he testified.

In an abundance of caution the Court addresses one final matter based on the wording of Wilkerson's allegation that "counsel interfered" with his right to testify. ECF No. 131 at 8. It is well-established that "[d]efense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992). The record reflects that both Attorney Hatfield and the court addressed Wilkerson multiple times about his right to testify. First, the district court informed Wilkerson of his right to testify at the outset of trial. ECF No. 116 at 4. The following day, the court again emphasized to Wilkerson that it was his right to testify and his choice

[8] Wilkerson's felony convictions are over ten years old, so for impeachment purposes the Court would also have to find in accordance with Fed. R. Evid. 609(b)(1) the "probative value, supported by specific facts and circumstances, *substantially* outweighs its prejudicial effect" (emphasis added).

whether to do so. ECF No. 117 at 198. Wilkerson affirmed he had had sufficient time to talk to Attorney Hatfield, who had answered his questions and gone through the pros and cons of testifying, and it was his decision not to testify. *Id.* at 198-199. Finally, before the parties rested, the court asked Wilkerson whether, having heard the testimony from the witnesses, he had changed his mind about whether to testify. *Id.* at 260-61. Wilkerson said that he had not, and he re-confirmed his understanding that this was his decision. *Id.* There is nothing in the record to support a finding that Wilkerson's will was "overborne" by Attorney Hatfield or that Attorney Hatfield's performance was deficient in this regard. *Teague*, 953 F. 2d at 1535.

### 3. Ground Three

Finally, Wilkerson argues in Ground Three that (1) Attorney Hatfield was ineffective during the sentencing hearing and (2) Wilkerson's sentence under the Armed Career Criminal Act (ACCA) is illegal. ECF No. 132 at 21. He contends Attorney Hatfield performed deficiently by failing "to present adequate evidence and argument in support of a lower sentence." *Id.* at 22.

Wilkerson acknowledges that counsel advocated in his behalf by (1) arguing that the ACCA did not apply, (2) arguing an upward variance was not appropriate, (3) objecting to the government's reliance on dismissed cases, and (4) summarizing Wilkerson's prior dismissed cases and asking that the Court not consider them. ECF No. 132 at 22-23; *see* ECF No. 87 at 5 (sentencing memorandum). However,

Wilkerson claims that Attorney Hatfield should have made additional arguments, including that Wilkerson had never previously served a "significant" term of incarceration for any of his prior offenses and that any violence associated with his prior offenses was at the hands of those he was associated with. ECF No. 132 at 28-29. He also claims Attorney Hatfield should have revealed the information noted in Grounds One and Two about the William Redd murder case. *Id.* at 29.

"Trial lawyers, in every case, could have done something more or something different." *Chandler*, 218 F. 3d at 1313. Omissions are inevitable, but "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776 (1987)). Counsel's conduct is presumed reasonable, and therefore to show a violation of *Strickland* a litigant "must establish that no competent counsel would have taken the action that his counsel did take." *Id.* at 1316; *see also Waters v. Thomas,* 46 F. 3d 1506, 1512 (11th Cir. 1995) (the test is not what the best lawyers would have done or even what most good lawyers would have done but whether "some reasonable lawyer at the trial could have acted. . . as defense counsel acted."). When courts are examining the performance of an experienced trial counsel such as Attorney Hatfield, the presumption that his conduct was reasonable is even stronger. *Chandler*, 218 F. 3d at 1316. Attorney Hatfield is a seasoned attorney with decades of experience. ECF No. 135 at 14. As such, he is entitled to deference in his decisions

regarding strategic choices at sentencing. *See Strickland*, 466 U.S. at 681 ("Among the factors relevant to deciding whether particular strategic choices are reasonable are the experience of the attorney, the inconsistency of unpursued and pursued lines of defense, and the potential for prejudice from taking an unpursued line of defense").

Further, Wilkerson has failed to demonstrate prejudice arising from Attorney Hatfield's allegedly deficient performance. The district court reviewed the Presentence Investigation Report, which included the circumstances of Wilkerson's prior cases and the sentences he received. The district court considered Wilkerson's possession of a firearm as a serious offense which could have resulted in harm to the public. ECF No. 119 at 72-73. The district court considered an upward variance from the guideline range but decided against it based on the mitigating factors presented. *Id.* Given that protection of the public was the district court's "most important consideration," *id.*at 72, it is unlikely Wilkerson's sentence would have been less had Attorney Hatfield made the arguments that Wilkerson suggests.

Additionally, Wilkerson's contention that his sentence is illegal under the ACCA is without merit. The definition of "serious drug offense" incorporates the controlled substances list in effect at the time of the defendant's prior state offense. *United States v. Jackson*, 55 F.4th 846, 849 (11th Cir. 2022). Thus, the Attorney General removing ioflupane from the regulatory definition of cocaine in 2015 has

no bearing on Wilkerson's 2003 Georgia trafficking in cocaine conviction. PSR ¶ 34; *See* ECF No. 135 at 17.

Finally, Wilkerson's argument that his robbery and assault convictions were not "violent" offenses because he "wasn't the person who was violent" (*see* ECF No. 131 at 19) fails. *See United States v. Roosevelt Coats*, 8 F. 4th 1228, 1245 (11th Cir. 2021) (a predicate crime "is not deprived of that status merely because the conviction may have been based on conduct that aided and abetted the crime."); *United States v. Hood*, No. 21-13903, 2025 WL 1454356, at *11 (11th Cir. 2025) ("[F]or ACCA predicate purposes, there is no distinction between a person charged as a principal and a person charged as an aider and abettor.").

Wilkerson was appropriately sentenced under the ACCA and he has not demonstrated deficient performance or prejudice by Attorney Hatfield at sentencing.

## III. CONCLUSION

An evidentiary hearing is not necessary to resolve Wilkerson's claims because "the motion and files and records conclusively show that the prisoner is entitled to no relief." See 28 U.S.C. § 2255(b); *Rosin v. United States*, 786 F.3d 873, 877 (11th Cir. 2015). Wilkerson has not shown that his trial counsel was constitutionally ineffective, or that he is otherwise entitled to relief, so his motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 should be denied.

## IV. CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), § 2255 Rules.

After reviewing the record, the Court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Based on the foregoing, it is respectfully RECOMMENDED:

1. The motion to vacate, set aside, or correct sentence, ECF No. 131, be DENIED.

2. A certificate of appealability be DENIED.

Done on August 17, 2026.

s/ *Midori A. Lowry*
Midori A. Lowry
United States Magistrate Judge

**NOTICE TO THE PARTIES**

The case was referred to a magistrate judge for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.